324 So.2d 855 (1975)
Dianne Terrance Casimere, widow of Thomas CASIMERE
v.
RYDER TRUCK RENTAL, INC., et al.
No. 7088.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1975.
Rehearings Denied January 13, 1976.
Writ Refused March 12, 1976.
*857 Wiedemann & Fransen, Lawrence D. Wiedemann, Matthew Belin, New Orleans, for plaintiff-appellee, Dianne Terrance Casimere, Widow of Thomas Casimere.
Porteous, Toledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for defendant-appellant Coca-Cola Bottling Co. of Louisiana, Ltd.
Before LEMMON, BOUTALL and BEER, JJ.
LEMMON, Judge.
Coca-Cola Bottling Company of Louisiana, Ltd. has appealed from judgments following a jury verdict in these two consolidated cases arising from a vehicular accident. The plaintiff in each case answered the appeal, seeking an increase in the award.

LIABILITY
The collision between an automobile and a left-turning tractor-trailer unit occurred about 7:30 p. m. on November 10, 1970 at the intersection of Claiborne Avenue and Earhart Boulevard in the City of New Orleans. Mrs. Walterine Jasper (plaintiff in Suit No. 7089) La.App., 324 So.2d 865 and Thomas Casimere (whose widow is the plaintiff in Suit No. 7088) were passengers in the automobile driven by Obry Henderson.[1] Casimere, Henderson and others were killed in the crash, which Mrs. Jasper survived. Coca-Cola's employee was driving the truck in the course of his employment.
Prior to the collision the automobile was traveling east and the truck was traveling west on Earhart Boulevard. The collision occurred when the truck attempted a left turn onto Claiborne Avenue. The configuration of the intersection and the position *858 of the vehicles after impact are shown on the following scale diagram (which exhibit is annotated with information established by other evidence in the record):

The five-axle truck unit was 52 feet in overall length. The 40-foot trailer was 12 ½ fet high, weighed 25,000 pounds and was carrying an additional 46,000 pounds of cargo. The car ran under the trailer at impact.
In answering special interrogatories, the jury found that the accident was caused by the combined negligence of the truck driver and of Henderson and that neither Casimere nor Mrs. Jasper assumed the risk. We discuss separately the issues as to negligence of Coca-Cola's driver, negligence of Henderson, and assumption of risk by Casimere and Mrs. Jasper.
Negligence of Coca-Cola's Driver
A motorist is prohibited from executing a left turn at an intersection until the movement can be made with reasonable safety. R.S. 32:104, 122; New Orleans City Code, 1956, § 38-76. Since the movement involves crossing the flow of right of way traffic, a high standard of care is required of the left-turning motorist.
The truck driver testified: He brought his unit to a complete stop in order to allow oncoming traffic to clear. He then commenced his turn because the nearest additional oncoming traffic consisted of three cars traveling at a normal rate of speed about two blocks or 800 feet away. He had attained a speed of five or six miles per hour when struck. He admitted that Earhart Boulevard in the area of the approaching traffic was straight and very well lighted and that the weather was clear and dry.
An off-duty deputy sheriff witnessed the accident from a position behind the truck *859 and testified that the truck, without stopping or braking, made the turn between five and ten miles per hour by cutting the corner and rolling over the curb. The screeching of brakes called his attention to the car, whose speed he estimated between 55 and 70 miles per hour. The posted speed limit was 35 miles per hour.
Other evidence established that the left rear tire of the car left a skid mark for 286 feet before the point of impact, beginning just on the neutral ground side of the dashed line which divided the two traffic lanes and continuing gradually to the left in a relatively straight line until the car reached the position shown at impact.
Three experts in accident reconstruction, after observing the accident location and being supplied with photographs and certain facts, related their conclusions as to the events leading up to the accident. A consensus of their opinions, based primarily on physical factors, established that the Henderson vehicle was traveling about 35 miles per hour at the time of impact.[2] The experts then worked backward from the assumed impact speed to determine the car's speed at various points prior to impact.
All experts agreed that Henderson's braking system malfunctioned and that the left rear wheel locked. Since a locked wheel produces 100% braking efficiency, the overall efficiency of the four wheels was at least 25%. While the experts disagreed as to the efficiency of the other wheels, the most credible testimony based on logical physics is that since the car did not yaw or spin abruptly to the left on the locked left rear wheel, the right rear wheel brake must have performed at relatively high efficiency and produced some balance in the braking process. Furthermore, some minimum efficiency must be assigned to the metal on metal friction developed in the two front wheels. Therefore, we consider the 50% minimum braking efficiency factor used by two experts to be reasonable in the light of the evidence.
A rounded drag factor of 0.8 for the surface of Earhart Boulevard represents a consensus of expert opinion.
By use of these estimated factors (impact speed of 35, braking efficiency of 50%, and drag factor of 0.8) and the known length of skid marks (286 feet), one can calculate that the car was traveling at 68 miles per hour just before the wheel began to leave marks on the road. One can further calculate that the car was approximately 343 feet from the point of impact at the earliest point the driver recognized the need to apply his brakes (286 feet of braking, plus 75 feet traveled at 68 miles per hour, or 100 feet per second, during the minimum reaction time of ¾ of a second).[3] Of course, these calculations do not reflect whether the driver recognized danger as soon as it was observable, but since the car's speed presumably was steady for some period prior to braking, one can calculate the location of the car at various points in time for several seconds before the collision.
To recreate the relative positions of both vehicles at these various points in time prior to impact, the two experts presented by defendants also estimated the turning speed of the tractor from various physical factors, including the limitations of a vehicle that size in executing a 90-degree turn in that particular intersection. Both experts assumed the truck slowed, but did not stop, to execute the turn. We deem acceptable these experts' estimate of a turning speed of five to ten miles per hour, the same speed range estimated by the eyewitness.[4]
*860 Both of these experts calculated the total turning distance, required for that particular truck, between the beginning point of the turn and the point of impact, and further calculated the time required for the truck to travel between those two points at an assumed speed. Then, working backward, they calculated the position of the car at the point in time when the truck began its turn. Using an assumed average turning speed of five miles per hour, one expert calculated that the car was 906 feet from the intersection when the truck began its turn.[5]
Coca-Cola argues that if the car was over 900 feet from the intersection when the truck driver began his turn, its driver was reasonable (and therefore not negligent) in commencing his turn when he did, particularly since a car traveling at or below the speed limit of 35 would require at least 18 seconds to reach the intersection at that speed. However, that argument fails because the experts' calculations were based on a false premise.
Both experts used the following position of the truck as the beginning point of the turn:

Obviously, a truck reaching the point shown above can still stop before interfering with the right of way of eastbound traffic. It is not until the point at which a left-turning vehicle enters the path of crossing traffic that danger attaches to the maneuver, and therefore it is the instant before this point is reached that the reasonableness of the maneuver must be measured.
*861 We conclude that the pertinent distance of the car from the intersection should have been calculated when the truck was at or slightly past the following position in its turn:

This is also the approximate position at which oncoming traffic would be alerted that the truck was not going to yield the right of way.
The distance between the point marked "X" and the point where the front of the truck was located at time of impact is 40 feet. A vehicle will travel 40 feet in 5.7 seconds at five miles per hour. As will be seen by the calculations discussed earlier (using certain reasonably estimated factors), the car skidded for 3.8 seconds, and the distance traveled in another two seconds at 68 miles per hour would be 200 feet. Thus, if the truck traveled the distance between the two points at five miles per hour, the car was only 468 feet from the intersection when the truck was located at point "X". Furthermore, since the position shown in Figure III is approximately six feet (in a straight line) before point "X", one can calculate that the car at its initial speed of 68 miles per hour was 548 feet from the intersection when the truck traveling at five miles per hour was located in the position shown.
Plaintiff's reconstruction expert conducted visibility tests at the intersection on an overcast night and testified that he could readily identify even an unlighted car at 750 feet and could judge speeds of lighted cars at approximately the same distance. Inasmuch as the record overwhelmingly established the area was well lit on the clear night of the accident, we conclude that Coca-Cola's driver should have seen the oncoming car and recognized the danger of entering the road in its path.[6] We note in *862 this regard the testimony of one of Coca-Cola's experts that when the truck was in the position shown in Figure III (if traveling at seven miles per hour), the driver of the car was just beginning to react to a stimulus he understood to require some action.[7]
Coca-Cola further argues that its driver was entitled to believe Henderson was traveling within the legal speed limit and that an automobile traveling at 35 miles per hour can be stopped with normal brakes and normal reaction time in less than 100 feet. The argument as to stopping distance is more pertinent to the determination of Henderson's negligence. The pertinent inquiry in determining Coca-Cola's driver's negligence is not whether Henderson could have executed an emergency stop if he had been driving safely, but whether Coca-Cola's driver could safely negotiate the turn when he did without causing observable motorists (approaching with the right of way) to execute an emergency stop.
As to any right to assume other motorists will obey the law, this right flows to right of way motorists and lessens their duty of lookout at intersections. On the contrary, a greater duty of look-out is imposed on left-turning motorists.
The Coca-Cola's driver's conduct must be judged by the actual circumstances surrounding the execution of the turn, including obvious substandard behavior by other motorists. A driver cannot execute a left turn across oncoming right of way traffic and then absolve himself from liability on the grounds that the readily observable motorist (approaching with the right of way) was exceeding the speed limit, or was inattentive, or had defective brakes. The pertinent determination is whether it was reasonable for the left-turning driver to proceed in the light of circumstances he should have observed in exercising the high degree of care required for this maneuver. We conclude on this record that Coca-Cola's driver should have observed Henderson's speeding vehicle approaching and should not have commenced the turn when it obviously was unsafe to do so.
Henderson's Negligence
The record clearly supports the jury's finding that Henderson's negligence was a legal cause of the accident.[8] While plaintiff asserts error in allowing evidence as to legal presumptions of intoxication under R.S. 32:662 (which by its terms is inadmissible in civil proceedings), and in reading that statute as part of the jury charge, we conclude (without considering intoxication or its effect on reaction) that Henderson could certainly have prevented the accident if he had been traveling at the legal speed and had maintained his braking system in a safe condition. Since there was no evidence to support a contrary conclusion, we would have been compelled to reverse the jury finding if that body had absolved Henderson of negligence. Therefore, irrespective of evidentiary error, we hold Henderson's negligence was a legal cause of the accident.
Assumption of Risk
Blood alcohol tests performed by the coroner's staff yielded results of 0.13 and 0.07 for Henderson and Casimere respectively.[9] Testimony by a pathologist *863 further established that a man of Henderson's size would have to consume seven to nine ounces of 85 proof whiskey (or equivalent beverage) within an hour before his death in order to obtain a level of 0.13. However, the pathologist pointed out that because of differing reactions between individuals to that amount of alcohol, "it would be a difficult judgment to make as to whether or not he had or had not been drinking just by casual observation."
Henderson's mother and brother testified that Henderson and Casimere were at the Henderson home from 3:15 to 6:00 p. m., had no alcohol to drink, and in fact had a meatball and spaghetti supper just before leaving. Mrs. Jasper testified she met Henderson, Casimere and two other men at a barbershop around the corner from Henderson's home (which was also near her mother's home), and that none of the men seemed to be intoxicated, although she did see one of the other men throw away a wine bottle. Those two men were to help her move the next day, and she left that location with them in Henderson's car to make arrangements for a truck. She remembered nothing thereafter.[10] Her mother testified that the group left her home about a half hour before she learned of the accident.
A passenger assumes the risk of accidents resulting from drunk driving if the passenger knew or should have known that the driver's ability was materially impaired by the intoxicants and nevertheless voluntarily rode with him, and if the alcohol-induced impairment substantially contributed to the driver's negligence. Marcotte v. Travelers Ins. Co., 258 La. 989, 249 So.2d 105 (1971).
The party relying on assumption of risk has the burden of proving the defense. In this case the bare evidence as to Henderson's blood alcohol level established only that he may have given indications of alcohol-induced impairment. All witnesses denied he gave such indications. And the evidence accepted by us as to time, speed and distances, pertaining to reconstruction of the accident, indicates that Henderson's reaction time was satisfactory.
A contrary conclusion by the jury would perhaps be supportable by reasonable inferences from the evidence in this record, but we cannot say that the conclusion the jury did reach was manifestly erroneous. Accordingly, we affirm the judgment as to liability in each of the consolidated cases.

QUANTUM
At the time of his death on November 10, 1970, Casimere was 23 years old. At the time of trial three years later, his life expectancy would have been 44 years and his work-life expectancy, 36 years.
Mr. and Mrs. Casimere were high school sweethearts in 1967, became engaged in 1968, and were married in June, 1969, several months after Casimere entered military service. He left for Viet Nam shortly after their marriage, but returned to Fort Polk, Louisiana later that year after being wounded. Mrs. Casimere joined her husband at Fort Polk in November, 1969 and stayed there until late September, 1970, when she stated she returned to New Orleans to find an apartment and to seek employment in anticipation of her husband's discharge from the service the following January. She further testified that her husband thereafter visited her on every weekend that he wasn't on duty.
Mrs. Casimere's grandmother (with whom Mrs. Casimere lived all her life and upon returning to New Orleans from Fort Polk) verified the happy relationship enjoyed by the couple.
As to loss of support, an expert in actuarial science computed a loss of earnings between the date of Casimere's death and *864 the date of trial to be $14,290.00 based on his military earnings as of the time he died. Using the military earnings of a serviceman of equivalent rank, computed as of time of trial, and using an interest factor of 5% and an inflation factor of 2%, the expert calculated that a fund of $186,400.00 would be required to yield that amount of monthly earnings over 36 years, at which time the fund would be entirely exhausted.[11]
On the other hand, Coca-Cola attempted to show that the Casimeres were somewhat estranged, by implication from evidence that Casimere had been in New Orleans from at least 3:15 until his death at 7:30 p. m. without seeing or calling his wife, that he was in the company of two young women when killed and had drunk some alcohol that evening, and that Mrs. Casimere had not actively searched for an apartment or a job during the six weeks after she had returned to New Orleans allegedly for that purpose.[12]
The jury award of $100,000.00 appears on its face to be meager in consideration of a reasonably anticipated loss of 44 years of marital happiness and 36 years of financial support. Nevertheless, much discretion is left to the judge or jury in assessing tort damages. C.C. art. 1934(3). We are simply unable to say that the jury abused its discretion if it accepted Coca-Cola's circumstantial evidence bearing on the relationship between the spouses at time of death and the reasonableness of Mrs. Casimere's expectations over the indicated period of time.
We also reject Coca-Cola's contention that the award was excessive.

CREDIT
Coca-Cola seeks credit against the judgment in the amount each plaintiff received in the interpleader action filed by Henderson's insurer.
Henderson's liability technically was not before the court in this case. Nevertheless, the Federal court order, authorizing both plaintiffs (represented by counsel) to withdraw a specified amount of the deposited funds, was introduced into the record prior to the dismissal of Henderson and his insurer, as of non-suit. Those funds were made available to plaintiffs in partial payment of their damages sustained in the accident which this record shows was caused by joint tortfeasors. Since any claim by Coca-Cola against Henderson for contribution would be subject to a credit for these funds, and since plaintiffs received certain amounts of these funds, justice and judicial efficiency require that the amounts received by each plaintiff be credited against the total liability of Coca-Cola.
The judgment in Suit No. 7088 is amended to allow a credit of $2,000.00 against the total amount of the judgment. As amended, the judgment is affirmed.
Amended and affirmed.

ON APPLICATION FOR REHEARING
PER CURIAM.
On application for rehearing Coca-Cola argues persuasively that the low awards indicate the jury rendered a compromise verdict and that it is unfair for us to rely on the jury's verdict as to liability while setting aside the verdict as to quantum. Coca-Cola therefore contends that when a jury has abused its discretion in some respect, the entire verdict should be set aside.
Perhaps the jury did apply comparative negligence in order to achieve fairness. The low awards, however, only suggest, but do not establish, this conclusion. Often *865 a jury returns low (or high) verdicts when liability is stipulated.
It is necessary for an appellate court in tort cases to review liability and quantum separately (at least until comparative negligence is adopted in the state). The reviewing court may therefore affirm a judgment as to liability by according substantial weight to the jury's apparent findings of fact, while setting aside the same jury's findings as to quantum (if the record justifies the latter result).
The application is denied.
Denied.
NOTES
[1] Obry Henderson and his insurer were named defendants in Suit No. 7088. Prior to trial, these defendants were dismissed as of nonsuit, pursuant to an order issued by the United States District Court in an interpleader action filed by the insurer.

Henderson and his insurer were not named as either defendants or third party defendants in Suit No. 7089, La.App., 324 So.2d 865.
[2] Two estimated 35 to 40 miles per hour; the third estimated between 30 and 50 miles per hour.
[3] A slower reaction time would have increased the distance traveled during reaction.
[4] Because the evidence indicates the truck driver did not stop before turning, we disregard his statement as to the six mile per hour maximum speed in the low gear he claimed he shifted to after stopping.
[5] The turning time for the truck (more than 80 feet at 5 miles per hour) was 10 seconds. During the same 10 seconds the car skidded for 3.8 seconds (286 feet at 52 miles per hour, the average between the impact speed of 35 and the traveling speed before braking of 68). During the remaining 6.2 seconds (10-3.8), the car traveled an additional 620 feet at 68 miles per hour, or 100 feet per second. The figure of 906 feet is the sum of 286 and 620.
[6] We note, but place little emphasis on, the fact that Coca-Cola's driver was nearsighted and restricted to driving with corrective glasses and that plaintiff's expert (who assisted in the police investigation) looked for and did not find glasses on the driver's person or in his truck, thus somewhat contradicting the driver's claim he was wearing his glasses while driving. Whether or not the driver was wearing glasses, he should have clearly see the car approaching at the distance indicated.
[7] This expert (who prepared the diagrams) assigned a two-second reaction time because of a motorist's slowness in comprehending at night the situation of lights turning in front of him and because of other evidence that Henderson had consumed some alcohol, which decreases perception.
[8] Because Henderson was dismissed as of non-suit, this issue was not precisely before the court. Nevertheless, in order to make the holdings to be discussed later, we here discuss that express jury finding.
[9] The preponderance of the evidence established that the sampling and testing were properly performed, despite plaintiff's argument to the contrary.
[10] Mrs. Jasper's sister accompanied them on the trip and was killed in the accident. Her blood alcohol test result was negative.
[11] This calculation did not consider the fact that income taxes must be paid on these earnings or the fact that the earnings supported both husband and wife.
[12] Evidence as to a widow's pension and as to Mrs. Casimere's dating after her husband's death were properly excluded from jury consideration.