700 So.2d 898 (1997)
Johnnie A. WALKER, et al.
v.
Deputy Susan A. McCARTNEY, et al.
Nos. 96-CA-706, 97-CA-180.
Court of Appeal of Louisiana, Fifth Circuit.
September 17, 1997.
*900 Robert M. Becnel, LaPlace, for Appellant Wilhemina Walker.
Brad G. Theard, Metairie, for Appellees/Appellants Deputy Susan McCartney and Harry Lee.
Laurence E. Larmann, James W. Hailey, Metairie, for Appellee Allstate Insurance Company.
Christopher E. Lawler, Kenneth W. Andrieu, Metairie, for Defendant-In-Reconvention Wilhemina J. Walker and Third-Party Defendant/Appellee Allstate Insurance Company.
Before CANNELLA, and DALEY, JJ., and ROBERT J. BURNS, J. Pro. Tem.
CANNELLA, Judge.
Plaintiff, Wilhemina Walker, and defendants, Deputy Susan McCartney and Harry Lee, Sheriff and/or Chief Officer for the Jefferson Parish Sheriff's Department, appeal from a judgment in an automobile accident case. All appeal the allocation of fault and plaintiff further appeals the award of damages. Defendant, Harry Lee, appeals the failure of the trial judge to award him 50% for a settlement made to the juvenile passenger, Jovan Walker, prior to trial. We amend the award and affirm as amended.
On September 27, 1991, plaintiff was proceeding west in the left lane (the lane nearest the median) of Lapalco Blvd., a four lane highway, in Jefferson Parish, Louisiana. Defendant, McCartney, was in the course and scope of her employment when she made a U-turn into the westbound portion of Lapalco Blvd. Plaintiff struck the right rear corner of the police vehicle. Plaintiff claims that the police vehicle pulled out suddenly from the U-turn, preventing her from avoiding the accident. Defendant, McCartney, claims that she pulled out, crossed the road and stopped her vehicle for several seconds at an angle in the right lane behind a potential speeding violator when she was struck. She claims that the potential traffic violator was stopped for a red traffic signal behind several other cars. Thus, when she pulled behind the violator, her police vehicle was partially obstructing the left hand lane in which plaintiff was traveling. Following the accident, plaintiff was taken to the emergency room at West Jefferson General Hospital.
On January 13, 1992, plaintiff and Johnnie Walker, individually and on behalf of their minor daughter, Jovan Walker, who was a passenger, filed suit for injuries they sustained in the collision. They alleged loss of consortium for Johnnie Walker. Suit was filed against defendant, McCartney, individually and in her capacity as a deputy of the Jefferson Parish Sheriff's Department, and against defendant, Harry Lee, as Sheriff and/or Chief Officer of the Jefferson Parish Sheriff's Department, and Allstate Insurance Company, the uninsured/underinsured carrier for the vehicle driven by plaintiff. On February 3, 1992, defendants, McCartney and Harry Lee filed a reconventional demand against plaintiff. They asked for indemnity or contribution for any damages they might pay to Johnnie Walker and Jovan Walker. These defendants also asked for the main demand to be dismissed and asked for the damages sustained by defendant, McCartney, and the vehicle. In addition, they included a third party demand against Allstate. Various pleadings were filed subsequently by the parties. On May 18, 1993, Allstate was dismissed pursuant to motions by plaintiff. On April 5, 1995, Jovan Walker's claims were dismissed pursuant to plaintiffs' motion due to settlement of her claims with defendants. On April 10, 1995, Allstate filed a subrogation agreement into the record disclosing the agreement of plaintiffs to pay to Allstate any amounts received by them from defendants up to $2,300.
A judge trial was held on April 10, 1995. Judgment was rendered on July 28, 1995 in favor of plaintiff in the amount of $45,633.45 for past medicals and $25,000 for general damages, totaling $70,633.45. However, the trial judge found both plaintiff and defendant, McCartney, to be 50% at fault. Thus, the trial judge awarded a total of $35,316.72 as plaintiff's damages. The trial judge further found that defendant, Harry Lee, sustained $1,310.28 in property damages to the police car and awarded him 50% of that amount, $655.14.
*901 On August 7, 1995, plaintiff and defendant, Harry Lee, filed motions for new trial or to amend the judgment. On September 20, 1995, Allstate filed a motion to clarify the judgment. On December 17, 1995, the trial judge denied plaintiff's motion for new trial. This matter was appealed to this court. This court remanded the matter for disposition of the outstanding motions. On December 12, 1996, the trial judge amended the judgment in favor of Allstate, awarding it $2,300 because of the subrogation agreement. He denied the motion for new trial or amendment of the judgment filed by defendant, Harry Lee. The two appeals were subsequently consolidated.
On appeal, plaintiff asserts that the trial judge erred in finding her 50% at fault. She further asserts that the trial judge erred in awarding inadequate general damages and in failing to award future medical expenses.
Defendant, Harry Lee, also appeals the judgment asserting that the trial judge erred in failing to award him 50% of the amount paid by him to Jovan Walker in the settlement of her claims.

PLAINTIFF'S APPEAL
Plaintiff first asserts that the trial judge erred, as to the cause of the vehicular accident, in substituting his own opinion for that of the sole expert and in apportioning 50% of the fault to plaintiff.
Plaintiff testified that she was driving westward on Lapalco when, suddenly and without warning, defendant, McCartney pulled out of a U-turn lane directly in the front of her car, causing her to collide with the right rear bumper of the police car. Plaintiff testified that the police car was not stopped and she did not notice a speeding driver before the collision. Plaintiff testified that she was traveling 35 to 40 miles per hour at the time of the collision. She stated that she applied her brakes "on impact."
Defendant, McCartney, testified that she was in the U-turn lane waiting to turn onto the westbound lane of Lapalco when a speeding car passed her. Since there was a traffic signal nearby that turned red, the speeder was forced to stop behind several other cars. The speeder was in the right lane. Defendant, McCartney, did not see plaintiff's vehicle approaching. Intending to stop the speeder, the deputy proceeded across the left lane, pulling into the right lane behind the speeder. Because there were several cars stopped for the light, she was unable to maneuver her car completely within the right lane, although the light had just turned green and the traffic was starting to move. However, she stated that she was stopped for several seconds, enough time to write down the speeder's license number. Thus, the rear of her car was angled and partially in the left lane when it was hit. Defendant, McCartney, did not have her flashing lights on because the speeder could not go anywhere and she said that she was waiting to get directly behind the speeder before turning on the lights. At the time of the accident, the weather was clear and dry. Defendant, McCartney, testified that she did not hear the squeal of brakes.
Plaintiff called an expert accident reconstruction expert, Robert Ehrlich, Ph.D (Dr. Ehrlich). He reviewed the police report, the depositions of the two drivers, photographs of the scene taken by him and the police and he visited the scene on one occasion. Dr. Ehrlich noted that no skid marks were made by either car. He stated that the police car was struck at an angle rather than straight on, according to the police report and the damage to the vehicle. He noted that the police car was hit on the right rear corner. The impact pushed the frame to the left and then the car went forward diagonally. He testified that plaintiff's car sustained damage to the right grill and radiator center. Since plaintiff had very little damage to the bumper, he concluded that she was braking when the collision occurred, causing the nose of her car to duck under the police car. Dr. Ehrlich stated that the police report showed no tickets were given to plaintiff. The report further found that defendant, McCartney, failed to yield. He stated that speed was not a factor and that the impact was not severe. Dr. Ehrlich testified that he thought that plaintiff was going in the 5 mile per hour range at impact. In other words, she was slowing. Dr. Ehrlich concluded that defendant's failure to yield caused the accident because plaintiff did not have time to avoid *902 the collision. In his opinion, plaintiff was not at fault.
On cross-examination, he noted that a vehicle can brake without leaving skid marks. On re-direct, he noted that plaintiff could have been traveling at 35 to 40 m.p.h. before the impact, but that at the impact, her speed was a "differential" of 5 m.p.h. between the speed of the two cars.
La. R.S. 32:123 provides in part:
A. Preferential right of way at an intersection may be indicated by stop signs or yield signs ...
C. The driver or operator of a vehicle approaching a yield sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway. Having slowed or stopped in this manner, the driver shall yield the right of way to any pedestrian legally crossing the roadway on which he is driving, and to any vehicle in the intersection or approaching on another highway so closely as to constitute an immediate hazard.
In Plaisance v. Epherson, 466 So.2d 485, 487 (La.App. 5th Cir.1985), this court stated:
Under our jurisprudence a motorist attempting to turn left must make certain the turn can be made without danger to normal overtaking or oncoming traffic and he must yield the right of way to such vehicles. He must refrain from making the left turn unless the way is clear, and if a collision occurs while he is attempting such a maneuver the burden is upon him to show that he was free from negligence. Washington Fire and Marine Ins. Co. v. Firemen's Ins. Co., 232 La. 379, 94 So.2d 295 (1957); Casimere v. Ryder Truck Rental, Inc., 324 So.2d 855 (La.App. 4 Cir.1975); Estes v. Hartford Accident & Indemnity Company, 187 So.2d 149 (La. App. 2 Cir.1966); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) ...
The burden of proving freedom from negligence in executing the turn rests upon the person making the turn ...
In Sanchez Fernandez v. General Motors Corporation, 491 So.2d 633, 636 (La. 1986), the Louisiana Supreme Court stated:
If a motorist fails to see what he should have seen, then the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen.
Allen v. Rawlins, 95-1592 (La.App. 4th Cir. 2/15/96); 669 So.2d 1282, 1284. In addition, an on-coming motorist has a right to assume that a left-turning motorist will yield the right-of-way. Whiddon v. Hutchinson, 94 2000 (La.App. 1 Cir. 2/23/96), 668 So.2d 1368, 1375.
On appellate review, the court's function is to determine whether the trial judge's findings were clearly wrong or manifestly erroneous. Johnson v. State Farm Mut. Auto. Ins. Co., 95-1027 (La.App. 5 Cir. 5/15/96); 675 So.2d 1161, 1163. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Johnson v. State Farm Mut. Auto. Ins. Co., 675 So.2d at 1163. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Johnson v. State Farm Mut. Auto. Ins. Co., 675 So.2d at 1163; Stobart v. State Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Johnson v. State Farm Mut. Auto. Ins. Co., 675 So.2d at 1163;; Stobart v. State Through DOTD, 617 So.2d at 882. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face *903 that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
The manifest error standard of review applies to the trial court's apportionment of percentages, as well as other factual issues. Allen v. Rawlins, 669 So.2d at 1284. Where manifest error exists, however, the appellate court is compelled to adjust the percentages. Id. at 1284.
After reviewing the testimony of the witnesses and the documentary evidence, we find that the trial judge was not clearly erroneous in finding each driver 50% at fault. Thus, we affirm the finding that plaintiff and defendant, McCartney were 50% at fault.

DAMAGES
The standard for the reviewing court to follow to determine whether an award of damages is inadequate was stated by the Louisiana Supreme Court in Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993):
... "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) ... In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).
The discretion vested in the trier of fact is great. Thus, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). In Youn, the court stated: "[R]easonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d at 1261; Tartar v. Hymes, 656 So.2d at 756, 760-61.
When the appellate court determines that the factfinder abused its discretion, it can then resort to a review of prior awards to determine the appropriate modification of the award. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. Prior awards under similar circumstances serve only as a general guide. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. In reviewing other awards, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Theriot v. Allstate Ins. Co., 625 So.2d at 1340. When the appellate court is compelled to modify an award, it will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. Theriot v. Allstate Ins. Co., 625 So.2d at 1340; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
Two doctors testified for plaintiff by deposition, which were introduced at trial into the record. The testimony shows that following the accident, plaintiff was taken to the emergency room at West Jefferson General Hospital. She was referred by the emergency room physician to a neurologist, Dr. Thor Borresen, who saw her on September 30, 1991 for complaints of headaches, neck pain, low back pain, shoulder pain, pain to her right knee and nausea. She had restricted movement in her low back and neck and was diagnosed with lumbar and cervical sprains and post-traumatic headaches. She was prescribed bed rest, medication and further tests were scheduled. Subsequent tests, x-rays of the low back, Computerized Axial Tomography (CAT scan) of the brain and an Electroencephalogram (EEG) were normal. The doctor continued to see plaintiff until May 15, 1992. During that time, she suffered from the same complaints, along with nausea from the medication. Her examinations revealed stiffness and restricted movement in her neck and back. She wore a *904 cervical collar for awhile. She also began to complain of numbness in her arm and a Magnetic Resonance Imaging (M.R.I.) was ordered to rule out disc problems in the neck. She was provided a Tens Unit for pain, prescribed physical therapy and her medications were either continued or changed. In November, she experienced night spasms and left hand numbness. The M.R.I. was done in November and was normal in the lumbar area. Her neck showed degenerative changes at C3-4, with narrowing, moderate spondylosis and moderate central disc protrusion. There was some spurring, but no herniation or rupture of the disc. At this time, the doctor continued to believe that the problem was muscular. Plaintiff continued to suffer the same symptoms, with muscle spasms. She was told to continue physical therapy. In December, carpal tunnel syndrome of the wrist/hand was ruled out by an Electromyography (E.M.G.). Because of her continuing neck complaints, the doctor sought a second opinion from another doctor in his office. Dr. Carl Culicchia saw plaintiff in December. Their findings were consistent, except that Dr. Culicchia also found glove hypesthesia of the left arm, which was not significant.
In February of 1992, plaintiff complained that she could no longer take long walks. She was tested for thoracic outlet syndrome, which was ruled out. She was encouraged to exercise and to attend therapy. She was given Darvocet -N-100, a mild analgesic and was told to return in two months. In May, her neck pain was worse and she was still experiencing numbness in her left forearm and hand. She was back to walking 2 to 3 miles, however, she had discontinued physical therapy. The final diagnosis was improving lumbar sprain, chronic neck sprain and degenerative C3-4 disc. Dr. Borresen stated that there was no compromise to the nerve roots or spinal cord, however, he suggested that plaintiff undergo "evoked responses" studies to test for spinal cord involvement. He testified that plaintiff's condition should have resolved by February of 1993 and saw no need for surgery. The doctor testified that other appropriate tests would be a myelogram and CAT scan if she failed to improve. He noted that, if her pain continued past February of 1993, he would question the diagnosis. The doctor stated that the degenerative disc and spurs took years to build up, but that it was possible that the trauma could have aggravated the degenerative disc disease.
In August of 1992, plaintiff was referred by her general practitioner to Dr. Kenneth Vogel, a neurosurgeon. He reviewed her previous tests and her physical examination showed mild limitation in motion in her neck, moderate muscle spasms and tenderness to the brachial plexus on the left. The cervical M.R.I. indicated a moderate bulge and degenerative changes at C3-4. Lumbar x-rays showed a mild bulge at L4-5 and mild narrowing of the LS-S1 nerve space. A cervical myelogram was performed in March of 1993, which was normal, other than mild spondylosis at C3-4. His preliminary finding was herniated cervical disc, but he sent her back to her physician for conservative treatment. Dr. Vogel saw plaintiff agin in March 1993 in the hospital where she underwent a cervical myelogram and CAT scan. Dr. Vogel was looking for an instability of the C3-4 disc. He further performed a cervical facet arthrogram and block to relieve plaintiff's pain. The facet arthrogram and block gave plaintiff pain relief for 48 hours.
Dr. Vogel saw plaintiff again in April of 1993. Because of her pain and the instability of the C3-4 disc, he offered a "cervical neurotomy", which is a procedure to interrupt the nerve with an anesthetic. This was done in May with an overnight stay in the hospital. Dr. Vogel stated that the procedure helps diminish pain in 90% of the patients. He testified that 10% have persistent problems, at which time a fusion may be considered. The doctor saw plaintiff again in July, six weeks later. He said that the procedure resolved the majority of the pain, however, she was still having mild pain and spasms and was suffering persistent rotator cup bursitis. He sent plaintiff to physical therapy. Plaintiff's next visit was in December of 1993. Plaintiff was suffering moderate neck, left arm and left leg pain. She told the doctor that she had a spontaneous exacerbation of the pain two months prior to this visit. She denied sustaining an intervening injury. He *905 noted that plaintiff had been going to physical therapy and when it was scheduled to end, she called in November for a prescription for an extension, which he gave her. Dr. Vogel saw plaintiff on December 21, 1993. He said that she still had mild limitation of neck movement with moderate spasm and pain in the left rotator cup. Dr. Vogel testified that it was not uncommon to have flare-ups within one year of a block procedure. He stated that it usually gets resolved with physical therapy and another type of block (epidural). He planned a series of epidural blocks with physical therapy for the neck and rotator cup. If the problems persisted, he would consider surgery. If the block were successful, he would expect plaintiff to reach maximum medical improvement within one year of the neurotomy, which would have been in May of 1994. If not, he would consider another block, another myelogram, re-evaluation and possible fusion. Dr. Vogel noted that the bulging found in 1992 had healed in 1993. The continued pain indicates instability in the disc. He attributed all of plaintiff's complaints to the accident.
The medical records show that plaintiff underwent an outpatient epidural block, in January of 1994. In March she was admitted as an outpatient to Mercy Hospital for a left cervical facet arthrogram and Marcaine blocks. She had one day of pain relief. On March 14, 1994, she was admitted to the hospital for a cervical median branch neurotomy at C3-4, C4-5, C5-6 and C6-7. She was discharged on March 15, 1994. She continued to have mild pain, spasm and restricted motion. In April, Dr. Vogel recommended cervical rehabilitation, physical therapy, cervical traction and continued care. In August of 1994, the pain continued. However, Dr. Vogel felt that she would reach maximum medical improvement in March of 1995 and he discharged her in August of 1994. Upon discharge, Dr. Vogel recommended that plaintiff obtain cervical rehabilitation, physical therapy, treatment for the left shoulder bursitis and an internal medicine examination for numbness of the hand. Plaintiff testified that she still suffers with a stiff neck, stiff shoulders and swollen and numb hands.
Plaintiff testified that the pain has interfered with her activities. She used to walk five miles, ride a bike, roller skate, landscape and paint. She still has problems with her neck and left shoulder and her hands are consistently swollen and/or numb. Plaintiff was active in her neighborhood organization and frequently passed-out flyers house to house. All these activities have been curtailed because of her pain.
Plaintiff testified that she was in another accident in April of 1992, when another car hit her fender. However, the damage was slight and she claimed she was not injured in that accident. She did not file a lawsuit for that accident.
Plaintiff argues that she should recover future medical expenses from the date that Dr. Vogel discharged her to March of 1995, the date of maximum medical improvement. The trial was held in April of 1995, one year after Dr. Vogel discharged plaintiff. However, those would properly be classified as past medicals since they would have been incurred prior to trial and no proof was introduced that plaintiff incurred those expenses. Thus, based on the evidence, we find the trial judge did not err in failing to award future medical expenses.
In regard to general damages, the trial judge awarded $25,000 and we find that the award is so low as to constitute an abuse of discretion. Plaintiff incurred $45,633.45 in medical expenses. She initially sustained lumbar and neck strains or sprains, headaches, shoulder pain and knee pain. Her lumbar and knee problems eventually resolved, but she has had persistent neck spasms and stiffness and shoulder problems. Plaintiff has undergone a cervical neurotomy, a three-level medial branch neurotomy, an epidural block, Marcaine blocks and two cervical facet arthrograms. She has been in physical therapy and traction was recommended at one time. Plaintiff has persistent rotator cup problems. She continues to suffer with neck and shoulder stiffness and numbness of her hands. The doctors testified that failure to improve would necessitate further studies and possible surgery. Under these circumstances, we find that the lowest reasonable amount within the trial court's *906 discretion for these injuries is $100,000. See: Glasper v. Henry, 589 So.2d 1173 (La.App. 4th Cir.1991); William Aycock v. Gulf Coast Transportation, Inc., 96-1471 (La.App. 3rd Cir. 4/2/97); 692 So.2d 1334. Damages are calculated as past medical expenses of $45,633.45 and general damages of $100,000, totaling $145,633.45. Since both plaintiff and defendants are found to be 50% at fault, the damage must be reduced to $72,816.72 for plaintiff.

DEFENDANT'S, HARRY LEE'S, APPEAL
Defendant, Harry Lee, asserts that the trial judge erred in failing to award him contribution from plaintiff for 50% of the settlement paid to Jovan Walker by the Sheriff, since plaintiff was found 50% at fault.
At trial of the matter, a stipulation was entered into which indicated that a settlement was reached to settle the claims of Jovan Walker in the amount of $6,931. No other evidence was presented regarding Jovan Walker's injuries.
After our review, we find that defendant, Harry Lee, is not entitled to contribution. It is well settled that the release of one solidary obligor prevents any other solidary obligor from seeking contribution from the released debtor. Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975, 980 (La.1995). That premise is inapplicable here because the defendant requesting contribution is the settling tortfeasor. Thus, he would normally be entitled to contribution. See: La.C.C. art. 1805; Morris v. Kospelich, 253 La. 413, 218 So.2d 316, 317 (1969); Ducote v. Commercial Union Ins. Co., 92-431 (La.App. 3rd Cir. 4/7/93); 616 So.2d 1366, 1371. However, to be entitled to contribution from the non-settling defendant, who is only liable for her pro-rata share of the amount settled, defendant must prove that the tort was in fact committed, that defendant was solidarily liable with him for the amount compromised and that the amount paid was not in excess of the damage inflicted. Here the first two criteria are met, but defendant failed to present evidence about Jovan Walker's injuries to prove the third criteria for recovering contribution, that the amount he paid in settlement was not in excess of the damage inflicted. Thus, we find that the trial judge did not err in denying the claim for contribution.
Accordingly, the judgment of the trial court is hereby amended to increase the award for general damages to $100,000. The judgment is affirmed in all other respects.
AMENDED AND AFFIRMED AS AMENDED.