756 So.2d 538 (2000)
Gerd KLAVENESS
v.
Paula G. MASSEY & State Farm Mutual Auto Ins.
No. 99-CA-867.
Court of Appeal of Louisiana, Fifth Circuit.
February 16, 2000.
*540 James O.M. Womack, Roberta Desio, James O.M. Womack, L.L.C., New Orleans, Louisiana, Counsel for plaintiff-appellant.
Lisa A. Montgomery, The Montgomery Law Firm, Metairie, Louisiana, Counsel for defendants-appellees Anna H. Stauder and State Farm Mutual Automobile Ins. Co.
Court composed of Judges CHARLES GRISBAUM, Jr., JAMES L. CANNELLA and CLARENCE E. McMANUS
CLARENCE E. McMANUS, Judge.
The instant matter arises out of a two-car accident which occurred at the intersection of Broad and Esplanade Streets in New Orleans on April 26th, 1997, which was controlled, at the time of the accident, by a flashing traffic light. Appellant is guest passenger Gerd Klaveness, who sued both her driver and the driver of the second vehicle. The trial judge found the driver of the car in which Klaveness had been riding free from fault in the collision. Klaveness now appeals this ruling, and finding manifest error in the judge's determination of fault, we reverse and award damages.
The proceedings below were instituted by suit timely filed against Anna Stauder, Klaveness's driver, a resident of Jefferson Parish, and the driver of the second vehicle, Paula G. Massey. Defendant insurers are Appellee State Farm Mutual Automobile Insurance Company, who covered Stauder, and Southern United Fire Insurance Company, who covered Massey.
The matter proceeded with no significant pretrial activity except for a Motion for Partial Dismissal of Paula Massey and Southern, which was granted, leaving Klaveness's driver Stauder the only remaining party defendant at trial.
A bench trial was held April 26th, 1999; at the conclusion of testimony, the matter was taken under advisement, and the Judgment with Reasons was rendered May 21st, 1999. A Motion for Appeal was timely filed.
On appeal, in brief, Appellant Klaveness argues that the trial judge was in error in having found Defendant Massey totally at fault.
The evidence regarding the collision is as follows. All parties are in agreement that the accident had occurred at about 7:00 A.M. on the date in question. All parties agree that the streets meeting in the intersection are four lanes, with medians, or "neutral grounds", running down each street to separate opposing traffic. *541 All parties agree that though the sky had been "overcast", the result of recent showers, there had been no problems with visibility, and the recent rain and wet streets do not seem to have been a factor in the accident. The parties' versions of the actual collision, however, are at odds.
Paula Massey testified that at the time of the accident she had been driving down Broad Street heading towards the interstate as she had approached the intersection. She stated that she had seen the flashing traffic signal "maybe" four or five blocks before the actual intersection, and that it had been flashing yellow facing her. She stated that she had approached the intersection cautiously and had looked both ways before entering the intersection. She did state, however, that she had not stopped before she proceeded"No, physically stop, no, I did not." She stated that she had seen Stauder's car "right when it [had been] crossing over" the median and that Stauder had not stopped in the Esplanade median before proceeding again. She stated that Stauder's vehicle "just ran in front" of her. Massey stated that she had "press[ed] her brakes" and had tried to avoid Stauder's vehicle, but that the collision had been "inevitable." When Massey was referred to the police report of the incident, she testified that the report would have been "incorrect" to indicate that the light facing Broad Street had been flashing red at the time of the accident.
Anna Stauder, the driver of the car in which Klaveness had been a passenger, stated that at the time of the accident they had been driving down Esplanade towards the river. She testified that she had seen the traffic signal four blocks away from the intersection, and that it had been flashing red in all four directions. She testified that she had stopped when she "got to Broad Street," waited for two cars to pass, proceeded into the intersection, and had stopped again in the neutral ground for two more cars to pass. She stated that she had gone on "as [the cars] cleared me." She stated that she had not seen Massey's car, and that at first, immediately after the impact, she hadn't realized what had happened. She testified that she had first seen Massey's car after the force of the impact pushed the cars apart and they had actually come to rest. She did testify that "... a red light means you got to (sic) stop."
Appellant, Gerd Klaveness, testified that she had noticed the light flashing red facing Esplanade as the car approached the intersection, and remembered that Stauder had stopped "at the first flashing red light" but had not stopped again "in the median." Klaveness testified that she had not seen Massey's vehicle before the collision. She also testified that there had been no way to see the lights facing Massey's vehicle from her and Stauder's perspective.
The record does not contain the police report of the incident, though, apparently, it was referred to during questioning, nor was the investigating officer called to testify.
The evidence of property damage is as follows. Though there are no photographs of Massey's auto in the record, she testified that the damages to her car had been to the front of the vehicle"all in front." There are photographs of Stauder's vehicle, which show damage to the middle and rear of the car where the impact took place. Stauder reviewed the photographs at trial, and her testimony identifying the damages confirms that the damage to her car was to these areas of the vehicle on the side where Massey's vehicle struck it.
In his Judgment with Reasons, the trial judge found that, "... Defendant, Anna H. Stauder properly stopped at both the intersection of Esplanade and Broad Streets and also upon entering the `neutral ground' between the intersections. Mrs. Stauder, thereafter, safely proceeded into the intersection when she was struck by the vehicle operated by Mrs. Massey. The Court finds that the sole cause of the *542 accident in question is due to the negligence and fault of Paula G. Massey in failing to obey the traffic signal at the intersection of South Broad and Esplanade Streets ..." The trial judge, therefore, found that Stauder had stopped, obeying the red traffic light, both entering the immediate two lanes of the intersection and before proceeding through the median into the farther two lanes. Because there was no finding of liability, there was no award of damages. Stopping did not fully discharge Stauder's duty, however, and we find that the trial judge was in error in holding that Stauder proceeded into the intersection in a safe manner; the error was in finding Stauder not at fault in the accident.
The duty of a motorist approaching a flashing red signal is set out, in pertinent part, as follows:
LSA-R.S. 32:234. Flashing Signals
A. Whenever an illuminated flashing red or yellow signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
(1) FLASHING RED (STOP SIGNAL) When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest cross-walk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign ...
The rules regarding stops at stop signs are as follows:
LSA-R.S. 32:123. Stop signs and yield signs ...
B. Except when directed to proceed by a police officer or a traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross walk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard. (emphasis supplied)
Stopping, therefore, does not fully discharge the duty of a driver negotiating such an intersection. Rather, Stauder had a duty to not only stop at the sign but to make sure after having stopped that it was safe to proceed through the intersection. Crews v. Babin, 98-931 (La.App. 5th Cir. 3/10/99), 732 So.2d 551, 554; Thomas v. Midland Risk Ins. Co., 98-1950 (La.App. 3rd Cir. 5/5/99), 731 So.2d 532, 535, writ denied, 99-1580 (La.9/24/99), 749 So.2d 634. See also Atwood v. State Farm Auto. Ins. Co., 95-454 (La.App. 5th Cir. 12/13/95), 666 So.2d 1187, 1190 (duty to keep proper lookout).
Stauder and Klaveness each testified that she had not seen Massey's car as it pulled into the intersection. The duty to look, of course, had been Stauder's. And she testified that she hadn't seen any oncoming cars as she pulled out from the neutral ground into the lane of Broad down which Massey had been driving. If a motorist fails to see what he should have seen, the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen. Fernandez v. General Motors Corp., 491 So.2d 633, 636 (La.1986); Severson v. St. Catherine of Sienna Catholic Church, 97-1026 (La.App. 5th Cir. 2/11/98), 707 So.2d 1026, 1030, writ denied, 98-0653 (La.4/24/98), 717 So.2d 1178 (emphasis supplied). Stauder should have seen Massey's car, should have stopped, and is at fault because she did neither. It is because the trial judge did not use these principles to *543 calculate fault on Stauder's part that he was in error.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." The test for the reversal of a fact finder's determination consists of two steps of analysisfirst, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and second, the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue, therefore, to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993) (numerous citations omitted). The manifest error standard of review applies to a trial court's apportionment of fault, and where manifest error exists, the appellate court is compelled to adjust the percentages. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 973 (La.1985); Walker v. McCartney, 96-706 (La.App. 5th Cir. 9/17/97), 700 So.2d 898, 903.
In adjusting percentages of fault attributable to each tort-feasor, a court should consider both the nature of each party's conduct and the extent of the causal relation between the conduct and the damages suffered. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. Watson, 469 So.2d at 973; Johnson v. State Farm Mut. Auto. Ins. Co., 95-1027 (La.App. 5th Cir. 5/15/96), 675 So.2d 1161, 1163.
We agree with the trial judge that Massey was at fault in the accident, even if we don't believe she ran a red light. However, because Stauder breached the above detailed duties we must also assign some degree of fault on her part, and this seems to be a case where the parties are equally at fault. Using the Watson factors, it seems fair to say that both parties were simply unobservant. Each should have seen the other, but it does not seem that anything other than inadvertence caused the collision. The risks associated with inattention were significantintersections are ubiquitous, however regulated, and careless drivers tend to meet in the middle. We will not say that Stauder's risk of harm was greater than Massey's simply because Stauder was driving a guest passengerthe risk here is that anyone will be injured in an automobile accident. The significance of the object of the parties' actions does not seem to have been a factor. The capacities of the actors seem clearly to have been equal, and the situation does not present us with any extenuating circumstances. And finally, since the Watson list cannot be exhaustive, we note that there do not seem to be any other significant factors operating here. It seems that each of these factors weighs equally on each side: all we can determine from the record is that both drivers were, at worst, careless, and that their vehicles collided at some point in an intersection. We therefore find the drivers each 50 % at fault.
Turning now to damages, we note that our Court may set damages in a suit where demands based on liability were rejected below and we have reversed that finding. Further, in fixing damages, we *544 are not limited to either the highest or lowest amount of the reasonable range of awards that would have been affirmed, but are bound to award an amount that is fair and just for the damages supported by the record. The primary considerations in the assessment of damages in a personal injury action are the severity and duration of the injury. Duckett v. K-Mart Corp., 92-385 (La.App. 5th Cir. 2/15/95), 650 So.2d 414, 416 (citations omitted). The record contains sufficient evidence to make such a determination, therefore, our assessment of damages is as follows.
We note initially that the impact from the collision was apparently quite severe. In addition, as a result of the initial impact, Stauder's car was pushed into a light pole, causing the occupants of the car to suffer a second jolt. Klaveness testified that at the moment of impact she felt "... spasms of pain shooting up into [her] head," and that after the accident her right foot was "hurt" and her right knee was "hurting badly." In addition, Klaveness suffered a concussion during the accident. Her testimony at trial was that she had suffered a momentary loss of consciousness on impact"I momentarily blocked (sic) out ..." Immediately after the accident, Klaveness was taken by an EMS vehicle to Memorial Medical Center, where she was treated in the emergency room. The triage report indicates that she was admitted with pain to the head and a hematoma on her right front scalp. She was given a cervical collar and released with instructions to take over-the-counter medication as needed.
Klaveness suffered several injuries in the accident, and she treated with Dr. Courtney Russo, M.D., an orthopedist, for all of the injuries. She also attended therapy for a time for neck and knee injuries. On her first visit to Dr. Russo, he diagnosed a hematoma to her right forehead and scalp with contusions of facial bones, a cervical sprain, a fractured fifth metatarsal, and, aggravations to a preexisting knee injury and a still healing rib fracture. Russo's testimony, which was admitted by way of a deposition, also indicated that Klaveness had suffered a concussion in the accident. Dr. Russo recommended conservative treatment, which, for each injury in turn, progressed as follows.
Klaveness testified herself at trial that she had suffered a concussion in the accident; Dr. Russo's testimony and narrative indicate that she reported this to him. There is some question whether Klaveness had denied the concussion to emergency room staffMichelle Davenport, an ER nurse, testified at trial that Klaveness had done so. However, the ER records are not absolutely clear on this, and Dr. Russo's testimony leaves no doubt that he believed Klaveness had sustained the concussion: over the course of treatment, Dr. Russo noted that Klaveness had suffered headaches as a result of the head injury, which he characterized as "post concussion syndrome." Dr. Russo's testimony indicates that the headaches had diminished by the time of a late May, 1997, office visit. Klaveness herself described the headaches as severe and unremitting for two months after the accident. She testified that they had been so severe immediately after the accident that she had been unable to engage in her normal activities without use of prescription strength pain medication.
The record contains photographs of Klaveness taken immediately after the accident, which show quite severe bruising on her face. Dr. Russo testified that at Klaveness's first visit, her right eye had been "swollen almost shut." Klaveness's eye was still swollen when she made an August, 1997, visit; and at a June, 1998, visit, Dr. Russo noted the development of a "palpable small bump" where the bruising had been on Klaveness's right forehead. Klaveness herself testified that the bump was still present as of the trial date: she testified that the bump is "about ... the size of a half dollar" and that Dr. Russo had indicated it is permanent.
Klaveness's back injury was to her cervical spineDr. Russo diagnosed a cervical *545 sprain on her first visit, prescribed pain medication and recommended a cervical collar. On Klaveness's May, 23, 1997, visit, she complained of neck pain, and when Dr. Russo made findings of continuing positive symptoms, he continued the pain medication and recommended therapy. At Klaveness's June 24th, 1997, visit, after Klaveness had attended therapy thirteen times, she reported that it seemed to be helping her neck injury, but as of a July 18th visit, after she had attended therapy approximately twelve more times, she discontinued the therapy which Dr. Russo had recommended. At Klaveness's August 5, 1997, visit, she reported that her neck was "doing fine," but at a September visit, complained again. Dr. Russo noted soreness, but no spasms, at this visit. When Klaveness was still complaining about her neck in May of 1998, Dr. Russo recommended over-the-counter pain medication and use of the cervical collar as necessary. As of November, 1998, and after several unremarkable intervening visits, Dr. Russo noted the presence of some lingering positive symptoms-slight tenderness and some decreased range of motion. Conservative treatment was continued. At Klaveness's last visit, on January 5, 1999, her neck was still sore and tender and Dr. Russo positively related any unresolved neck symptoms to the automobile accident. In addition, Dr. Russo testified that treatment for Klaveness's back injury could continue "indefinitely." He diagnosed a 10% physical impairment to the body as a whole resulting from the neck injury, and further related 8 to 10% of this figure to the accident and only 2 to 4% of the disability to agerelated degenerative changes to Klaveness's cervical spine.
Klaveness herself testified that her neck hurt a great deal "to any movement" immediately after the accident. She testified that she felt spasms for as much as two months afterwards. Klaveness stated that she had discontinued the recommended therapy because she felt that she could accomplish as much with home exercises and swimming therapy through her health club. Finally, she stated that as of the trial date, her neck had a continuing limited range of, and "cracked" with, any motion.
The injury to Klaveness's foot was a fracture of the fifth metatarsal of her right foot which, Klaveness testified, had at first caused problems with walking. Dr. Russo noted reduced swelling of Klaveness's foot over the course of her treatment with him, and as of a June 24th, 1997, visit, noted that the fracture had healed. Klaveness did not report any continued problem with her foot as of trial.
The accident aggravated a healed crushed left kneecap injury which Klaveness had suffered in 1979. At her first visit with Dr. Russo, he noted a knee sprain with swelling and tenderness. At a June 24th, 1997, visit, Dr. Russo noted that Klaveness's knee condition had deteriorated since the last visit, and at an August 5th visit, when the knee was not resolving, gave her a cortisone injection. The physical therapy log from Healthsouth Sports Medicine & Rehabilitation Center shows that Klaveness did have therapy for her knee, though only on a few occasions. Dr. Russo administered cortisone again on November 18th, 1997. As of September, 1998, Klaveness's knee was still sore, and on October 9th, 1998, Dr. Russo noted a continued restricted range of motion. At Klaveness's last reported visit, January 5th, 1999, Dr. Russo again injected her knee with cortisone. Dr. Russo diagnosed Klaveness with a 6 to 8% disability from the knee injury, and in addition, testified that the percentage of disability resulting from the automobile accident was greater than any disability resulting from the healed, and until the accident, for the most part, asymptomatic, fracture. As with the cervical injury, Dr.Russo testified that treatment for the knee could continue indefinitely.
Klaveness testified that though her knee had "flared up" occasionally after the initial fracture, such incidents had been infrequent. *546 She testified that movement had been painful for "quite some time" after the accident and that walking had been difficult. She stated that she is still "cautious" with the knee, and that she is unable to work in her garden as much as she had been able to. Finally, Klaveness testified that since corticosterone treatments cannot be administered on an unrestricted basis, she is forced to "live in pain" during the periods when they are not recommended.
At the time of the automobile accident, Klaveness was probably still recovering from a fractured rib, which injury had occurred in a fall in March of 1997. This injury was aggravated in the accident, and Klaveness was recommended to wear either a brace or a longline bra to support the ribs. Klaveness still complained about sore ribs at an October 9th, 1998, visit, but as of her last visit in January of 1999, Dr. Russo's testimony was that the rib fracture had resolved. Klaveness testified that though the pain associated with the rib re-injury had been "fairly severe" at first, it had resolved and was completely gone by the time of trial.
Appellant Klaveness, therefore, suffered several fairly serious injuries, some of which took over a year to completely resolve. At least two of the injuries, the knee injury aggravation and neck injury, resulted in permanent impairment. And while we cannot, since there were no photos of Klaveness as of the trial date, classify the forehead lump as a disfiguring feature, there is no question that there is some permanent physical abnormality. Bearing in mind the guidelines set out in Duckett, in consideration of the severity and length of the multiple injuries sustained, we feel that Klaveness is entitled to a sum of $35,000.00 for her general damages. We are aware that some of the injuries resulting from the accident were superimposed on preexisting ones. A defendant takes his victim as he finds him, however, and must compensate the victim for any harm that does aggravate pre-existing injuries. Perniciaro v. Brinch, 384 So.2d 392, 395-6 (La.1980); Rabathaly v. Breaux, 99-244, (La.App. 5th Cir. 7/27/99), 738 So.2d 1182, 1184.
Regarding medical specials, though the record contains a stipulation to the authenticity of the medical evidence, we cannot find any figure for their total amount. Klaveness testified herself that she had received $5,000.00 under the med pay clause of Stauder's policy, but she did not state whether there were outstanding medical bills as of the time of trial. Nor, since some of the injuries may require treatment in the future, did she or Dr. Russo give an amount for this. Any additional medical special damages are not proven, therefore, and we cannot award any amount to cover them.
For the foregoing reasons, we reverse the trial court judgment finding defendant Stauder free from fault, enter judgment finding Stauder and Massey each 50% at fault, and enter judgment for damages in Klaveness's favor in the amount of $35,000.00, with appellee State Farm to pay half of this amount, including judicial interest from date of demand, and with appellee to pay half of appellant's trial court costs and costs of appeal.
REVERSED.