JjMcMANUS, Judge.
This matter arises out of an automobile accident in which Plaintiffs Appellants assert the Louisiana Department of Transportation and Development (DOTD) was at fault. Finding manifest error in the trial judge’s apportionment of fault, we reverse this finding, find the DOTD 25% at fault in the accident, and award damages.
*251 STATEMENT OF THE CASE
Suit in this matter was filed on September 19, 1994, originally naming as Defendants Scott Falgout and his automobile liability insurer, State Farm Mutual Automobile Insurance Company. Falgout was the driver of the automobile into which Plaintiffs’ driver collided; Falgout and State Farm were ultimately dismissed from the suit. Also added, then dismissed, was Falgout’s employer, A3M. A summary judgment was granted by the trial judge dismissing A3M and their insurer on the grounds that Falgout had not been in the course and scope of his employment when the accident occurred.
The named Plaintiffs were the guest passengers of the other driver involved in the accident and their parents. These Plaintiffs are Felton and Janice McBride, on behalf of the (then) minors, Jason and Paul McBride, who also sought damages for loss of consortium; Charlette (spelled Charlotte in the transcript) Mazique Davis, on behalf of the minor Eric Mazique, who also has a loss of consortium claim; Presley and Ruth Taylor, on behalf of the (then) minor Ponce Taylor; and George and Leona Grimsley, on behalf of the (then) minor Justin Grimsley.[1]
| ¿Though the DOTD had not originally been a Defendant, on July 26, 1995, the Plaintiffs added the Department by way of their First Amended Petition for Damages.
A Third Supplemental and Amended Petition was filed on January 21,1997, substituting Jason McBride, Ponce Taylor and Jason Grimsley for their parents as plaintiffs for their individual claims.
A bench trial was held on August 7 and 8, 2000. At the conclusion of Plaintiffs’ case, the DOTD moved for an involuntary dismissal, which was denied. The case was then submitted for judgment on the evidence produced only by Plaintiffs. A written judgment and reasons were filed into the record on November 4, 2000. A motion for new trial was denied on December 29, 2000.
Plaintiffs-Appellants now appeal the judgment, and assert the following errors:
1. The trial judge erred in failing to hold the DOTD responsible because plaintiffs proved all of the essential elements of strict liability as well as negligence;
2. The trial judge was wrong in failing to find that plaintiffs’ uncontroverted evidence established a prima facie case;
3. As to the issue of causation, the trial judge was wrong in narrowly focusing his analysis on just one party because the evidence showed that there was more than one cause-in fact of the collision.
FACTS
The accident in question occurred on July 28, 1994. On this date, Jason and Paul McBride, Eric Mazique, Ponce Taylor and Justin Grimsley were guest passengers in the vehicle being driven by a friend, Lashonda Williams (referred to sometimes as Lashonda Short). The accident occurred at the intersection of LA Highway 3188 (LA 3188) and Fairway Drive, located in LaPlace. Plaintiffs alleged fault on the part of the DOTD based on their assertions that the intersection in question was defective, an assertion they sought to prove by means of testimony regarding public complaints about the intersection, and through the testimony of their expert, a traffic engineer.
LA 3188 is a four-lane road, divided by a wide median, running in a north-south di *252 rection. At the time this accident occurred, in the block leading to the actual intersection, the lanes south of the intersection extended into the median to create a left turn lane, or bay, to funnel cars turning left from LA 3188 onto Fairway Drive. The 1Janes running north from the intersection, at that time, did not include a marked lane for vehicles turning left. Fairway Drive is a two-lane road, running in an east-west direction. The intersection is controlled by traffic signals hanging at several places over the streets. The signal cycle did not, in 1994, provide an interval during which northbound vehicles turning left onto Fairway would have a protected turn.
Williams was executing such a turn when the accident occurred. She testified that she had been proceeding in a northerly direction down LA 3188, intending to turn left at the intersection onto Fairway. She stated that as she approached the intersection, her light was green, but her view of traffic proceeding towards her on LA 3188 was obscured by three or four cars stopped in the southbound turn lane. She testified that because her vision was blocked, she inched forward into the intersection, stopped before she began to actually execute the turn, and proceeded to turn onto Fairway. Williams also testified that her view was partially obscured by a vehicle stopped in the intersection. Though the testimony is not exactly clear, and the diagrams contained in the record are not helpful, Williams described a car “coming out of the Texaco station” that “kind of impeded my vision.because it was slanted, so I really didn’t have too much of a range of vision.” Williams testified that she had not seen Falgout’s car until the two cars collided.
The guest passengers confirmed that Williams had stopped before she proceeded into the intersection.
Falgout had been driving in a southerly direction down LA 3188 when the collision occurred. Falgout testified that he had not seen Williams car until it was almost directly in front of him. He, too, testified that his vision of cars in the opposing lane of LA 3188 had been obscured by vehicles stopped in the southbound left turn lane.
The record also contains evidence produced to show that the DOTD was at fault in the accident because the intersection was defective — Appellants assert that the intersection was hazardous because there was no turn lane for northbound vehicles turning left from LA 3188 onto Fairway Drive, and because the signal did not provide for a protected turn for these vehicles.
LThough it appears that the intersection had always been a problem, it seems that the real impetus to have controls installed at the intersection started with the efforts of Robin Malain, whose sister had been killed in an accident at the intersection in 1991. The intersection had originally been uncontrolled, and through efforts in 1991 and 1992, Malain, citizens’ groups, and St. John Parish officials were successful in having an initial change made — a traffic signal had been installed in October of 1992. However, as of the date of the instant accident, as noted, the signal did not provide for a protected left turn for northbound vehicles turning left onto Fairway. Nor did the intersection provide a lane marked for these vehicles only.[2]
*253 Arnold Labat, who had been St. John Parish President in 1994, testified he had been aware that thé intersection was a “very unsafe” area. He testified that he had received complaints from parish residents, which had prompted him to speak with state Senator Landry and Representative Accardo about the problem. The record also contains a letter from Labat to Francis Becnel, Traffic Services & Operations Engineer for the DOTD, dated January 31, 1992, in which Labat requested a study regarding possible changes in the intersection. The letter states that Labat had received “numerous citizen complaints concerning the lack of a left turn lane” at the intersection, and, in addition, expresses the opinion that a “turn lane would allow traffic traveling in a northerly direction on Belle Terre Boulevard [LA 3188] to more safely turn left onto Fairway Drive.” Finally, Labat testified that he had been involved in a joint project between St. John Parish and the DOTD, which started in August of 1994, and which ultimately resulted in the installation of a turn lane for northbound, left-turning vehicles, and a signal device providing a protected turn for these vehicles. He testified that the parish had provided the funds to create the turn lane, though LA 3188 is maintained by the state, because he “felt strongly enough” that that the changes were needed.
The record contains a copy of the Official Proceedings of the St. John the Baptist Parish Council, from a meeting held on December 14,1993, during which the eoun-cil | ^adopted the motion to “construct, at [the parish’s expense], an east-west turn lane from LA Highway 3188 at its intersection with Fairway Drive.” Resolution 93-94 also includes the council’s findings that “the intersection of LA Highway 3188 and Fairway Drive, LaPlace constitutes a safety hazard as it currently exists.”
Joseph Accardo had been a member of the Louisiana House of Representatives in 1994. He testified that the intersection had originally been a “t-intersection,” when Fairway Drive hadn’t actually crossed LA 3188; at that time, the intersection had been uncontrolled. However, with the completion of the Belle Terre subdivision to the east of LA 3188, Fairway had been extended over the highway to continue into the development. The development also had the effect of increasing traffic passing through the intersection. Accardo testified that he had attended several St. John Parish council meetings to discuss the intersection. He stated he had done so because his “duty as a State Rep. was to represent the views of the community. And the views of the community seemed to be that the intersection was dangerous and they wanted a signal light and they wanted a protected turn lane.”
Michael Maggiore, who, in 1994 had been the council representative for St. John Parish District 4, testified that as a council member, he had been “concerned” that the intersection had not been designed to include the turn lane, and testified that he had been aware of numerous accidents that had taken place in the intersection even after the signal had been installed. He testified that in his own experience, the left turn from LA 3188 onto Fairway was dangerous because the motorist would have been:
sitting in a full flow of traffic, to me, and I had to do this on many occasions, it was scary to ipe sitting in a full flow lane and then somebody could come up behind you, and then on the other side, you’re looking over. I mean, they had a turn lane and they could get backed up and you couldn’t see all the way across, so sometimes you had to proceed. You would kind of stop and go and look. It *254 was hard. It wasn’t an easy thing to do .... just trying to get off of the main road.
The only expert to testify, Duaine Evans, a traffic engineer, testified that the intersection (as it was configured in July of 1994) was defective because it did not include a lane for northbound cars waiting to turn left onto Fairway, with an | ^accompanying signaled, protected turn. In Evans’s deposition, in which he actually provides a somewhat more detailed opinion, he states that the intersection presented a significant exposure or, hazardous exposure, to vehicles making the left turn in that they were making it unprotected, and because there would be times when their view of oncoming traffic could be obscured by other vehicles. Evans also testified, in his deposition, that even in situations in which the left-turning drivers’ vision would not be blocked, the intersection would still present a hazard because the drivers would be turning into traffic “unprotected.”
The trial judge gave lengthy written reasons for the judgment. In part, he found that
Lashonda Williams turned left into the path of a more favored roadway.... Plaintiffs’ argument that Ms. Williams’ vision was obscured was not disputed at trial, and the court accepts that fact as true. However, what is disputed is how a prudent driver behaves when confronted with a situation which involves obscured vision.... The accident in this case was caused solely by the negligence of Ms. Williams, and thus the court allocates 100% fault to her. But for Ms. Williams pulling into traffic, before she determined it was in fact safe to do so, the accident would not have occurred. .... There was no evidence, other than the fact that accidents had previously occurred at the intersection, that it was defective .... the presence of multiple cars backed up waiting to turn would put a reasonably prudent driver on notice that there was traffic headed in the southbound direction, and that great caution should be used to cross the two lanes of traffic on [LA 3188].
The trial judge found the DOTD not at fault, under either a strict liability or negligence theory.
In denying the Motion for New Trial, regarding DOTD’s duty, the trial judge stated, “DOTD certainly owed a duty to the passengers of the car as well as to a prudent and attentive, or momentarily inattentive driver. However, DOTD is not responsible for injuries sustained by a driver or her passengers when the driver violated a duty owed to the passengers of the vehicle.”
Because the trial judge found Williams to have been totally at fault, there were no awards of damages. However, the record does contain the following evidence regarding damages.[3]
17Jason McBride, who had been seated immediately behind Williams when the accident occurred, was thrown from the car on impact. He initially suffered a loss of consciousness, and his first complaints were of pain in his legs, head and arm. He was bleeding from his mouth, and his hand and wrist were bleeding. Jason testified that he had sustained fractures to his “back and spine area.” He also suffered a lacerated spleen and a broken finger. Jason was treated at River Parishes Hospital, then Ochsner Hospital, and even after his release, his back injury required bed *255 rest for a “pretty long time.” He had also been required to wear a splint for his finger that covered his hand and wrist. Jason testified that he was still experiencing back pain as of the trial date; he also has permanent scars on his lips, and the knuckles on his injured hand are apparently somewhat deformed.
Paul McBride’s first complaints after the accident were of a cut lip and foot. However, he testified that he was ultimately diagnosed with broken bones in his hips, and he had been hospitalized for three weeks after the accident. He had been confined to bed for a further two weeks after his release from the hospital, and he had been required to undergo therapy for some time once he was able to stand. As of trial, Paul’s hips remained displaced, and he had been prescribed an orthotic device (described by him as a “heel”) for one of his shoes. Paul testified that even as of the trial date he was unable to sit comfortably, and he testified that he is teased by schoolmates for his “twisted” walk.
Janice and Felton McBride, Jason and Paul’s parents, both testified that neither boy has been the same since the accident. Both testified that the boys still experience pain resulting from their injuries, and Janice testified that neither of the boys is as active as he used to be. In addition, Janice testified that though Paul had been too young for household chores when the accident occurred, Jason, who had been in the habit of helping with such tasks, “stopped” helping during a period after the accident.
Eric Mazique was sitting in the back seat when the collision occurred. He was trapped in the ear until emergency workers were able to free him. He testified that he began bleeding from one of his hands and his neck immediately after the collision, and he intermittently “blacked out.” He testified that he had been diagnosed with a fractured | «pelvis and a “messed up lower back.” Eric was hospitalized for roughly a month after the accident, remained in bed at home for another three weeks, and received therapy for “several months.” He testified that he was still experiencing back pain as of the trial date.
Charlette Mazique Davis, Eric’s mother, testified that Eric had suffered headaches and stomach problems during the months he had been confined to his bed. In addition, she testified that though Eric had always voluntarily done chores at home, he has been unable to since the accident.
Ponce Taylor, who had been seated next to Williams when the accident occurred, had been able to step out of the car on his own after the collision. Shortly after he had exited the car, however, he felt a “sharp” pain in his stomach and fell to the ground. He was treated in the hospital for “deep lacerations” on one of his arms and a ruptured spleen, which was removed on an emergency basis. Ponce testified that he had remained in the hospital for several weeks, with staples in his arm and stomach. In addition, because he was catheterized but had never been circumcised, he developed an infection that eventually required an in-office circumcision. Ponce testified that he has suffered with chronic fatigue since the accident, and he stated that he is left with scars on his arm and stomach.
Presley Taylor, Sr., Ponce’s father, testified that Ponce has not been “the same child” since the accident. Taylor testified that Ponce is unable to participate in the same activities he had enjoyed before the accident, and that he is also unable to help cut grass, wash cars or clean house.
Justin Grimsley had been thrown from the car on impact, and immediately experienced pain “all over.” He was hospitalized *256 for several weeks for a crushed pelvic bone, broken ribs and “pulled ligaments” in his lower back. Grimsley testified that his recovery had been a slow progression from bed rest, to a wheelchair, to crutches. In addition, he testified that he had been treated by a psychologist for several months for problems resulting from the accident and his injuries. He testified that he still experiences chronic pain from his injuries, and that he is often angry or moody. Within several months before trial he had been treated by his physician for this pain.
|qLAW AND ARGUMENT
Appellants’ assignments of error revolve around their assertion that the trial judge should have found the DOTD at fault in the instant collision. We agree that the DOTD was, at least, partially at fault.
The duties of the DOTD are set out by statute. LSA-R.S. 48:21 A provides:
The functions of the department shall be to study, administer, construct, improve, maintain, repair, and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law.
LSA-R.S. 48:35 A states:
The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system shall conform to such safety standards.
Further, under 48:35 F(l)(a), “the state, the Department of Transportation and Development and any political subdivision of the state has a duty to maintain, repair, construct, or reconstruct any public road, highway, bridge, or street, or any portion thereof, in a manner that it not unreasonably dangerous for a reasonably prudent driver.”
The principles applicable to determine whether the DOTD has been at fault in causing an accident are as follows:
Under Louisiana law, liability for injuries sustained by one as the result of a defective condition of a thing is based on legal fault, i.e., strict liability. See LA. CIV. CODE ANN. art. 2317. Louisiana’s codal provision for legal fault is found in LA. CIV.CODE ANN. art. 2317 which provides:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....
In an action asserting liability under LA. CIV.CODE ANN. art. 2317 before 1996, the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect | inthat presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiffs damages.
There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-fact, we note that many factors are considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) *257 the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved.
Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682.
Under LSA-R.S. 32:122, the driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard. Further, a left turn is one of the most dangerous maneuvers a motorist may execute and requires the exercise of great caution. Theriot v. Lasseigne, 93-2661, at 8 (La.7/5/94), 640 So.2d 1305, 1312. A left turning motorist involved in an accident is burdened with a presumption of liability, and the motorist must show that he is free of negligence. Duplantis v. Danos, 95-0545, at 10 (La.App. 1 Cir. 12/15/95), 664 So.2d 1383, 1389-90.
The trial judge found that Williams was totally at fault in the instant accident, and this finding is entitled to manifest error review. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
There is no question that Williams was partly at fault. Regarding DOTD’s fault, under the factors enunciated in Lasyone, there is no question that LA 3188 is in the DOTD’s custody. Further, we have no doubt that the condition of, or, defect in, the intersection was a cause-in-fact of Plaintiffs’ harm. Therefore, in order to say that DOTD was át fault in the accident, we must find that the defect created an unreasonable risk of harm.
Having reviewed the record in light of the factors set out in Lasyone, and having given consideration to each of these factors, we find that the following ones weigh most heavily in finding that the intersection was unreasonably dangerous.
In First, we find that the “claims and interests” of the parties had been overwhelmingly in favor of having the intersection modified to provide for protected left turns onto Fairway. The parties are (were) the residents of St. John Parish, and the record shows that a large number of them had repeatedly sought help from the Parish Council and Parish President on this matter. Both Arnold Labat, a former Parish President, and Joseph Ac-cardo, a state representative, testified that they got involved in improving the intersection as a result of “community” or “citizen” complaints. Further, Labat’s testimony and records from the parish council demonstrate without question that the parish government agreed that the changes were necessary, and that the parish had in turn sought help from the DOTD.
The probability of risk occurring was obvious and significant. Even without any reference to protected DOTD records, there was evidence that accidents had been a recurring and frequent occurrence at the intersection. The risk was directly connected to the faulty design of the intersection and the inadequate signal device. The risk was described in the testimony of Michael Maggiore, who, of his own experience, stated that the danger for northbound drivers turning left onto Fairway arose when these turning motorists were unable to see past lines of ears stopped in the lanes north of the intersection waiting to turn onto Fairway. Further, since these stopped vehicles also obscured the vision of motorists continuing through the intersection in a southerly direction, these drivers had been forced to proceed into the intersection unaware of whether someone might try, suddenly and unexpectedly, to turn in front of them. The other driver involved in the instant collision, Scott *258 Falgout, testified that this was precisely what had happened to him—he had been unable to try to avoid Williams because he had been unaware that Williams was trying to turn onto Fairway. Had the signal controlling the intersection provided Williams with a protected turn, this hazard would have been eliminated.
The only expert testimony produced at trial, that offered by Duaine Evans, a traffic engineer, was to the effect that the intersection (in 1994) had been hazardous because of l^the blocked vision in both directions and because the northbound, left turning drivers had been forced to turn into oncoming traffic, to execute an “unprotected” turn.
The gravity of the consequences was also serious. ' The injuries to -Williams’ guest passengers were very serious, and several of the Plaintiffs have some permanent damage. The consequences could have been worse.
Having considered all of the factors at play in determining whether the intersection was unreasonably dangerous, we find that it was so, and the DOTD was therefore at fault in having caused the instant accident. Where error in the determination of fault is shown, an appellate court is compelled to adjust the percentages. Klaveness v. Massey, 99-867, at 5 (La.App. 5 Cir. 2/16/00), 756 So.2d 538, 543; Walker v. McCartney, 96-706, at 7 (La.App. 5 Cir. 9/17/97), 700 So.2d 898, 903. However, as noted, there is no question that Williams was also at fault, and we find the DOTD was 25% at fault and Williams was 75% at fault in the collision.
Turning now to damages, we note that our Court may set damages in a suit where demands based on liability were rejected below and we have reversed that finding. Further, in fixing damages, we are not limited to either the highest or lowest amount of the reasonable range of awards that would have been affirmed, but are bound to award an amount that is fair and just for the damages supported by the record. The primary considerations in the assessment of damages in a personal injury action are the severity and duration of the injury. Duckett v. K-Mart Corp., 92-385 (La.App. 5 Cir. 2/15/95), 650 So.2d 414, 416 (citations omitted); Klaveness, 99-867 at 6-7, 756 So.2d at 543-4.
Jason McBride suffered a temporary loss of consciousness with no permanent damages, an injured back, a lacerated spleen and a broken finger. In addition, he has permanent scars on his lips and some disfigurement to one of his hands. In light of these injuries, we award Jason $75,000.00.
Paul McBride’s most serious injury was the fractured pelvis resulting in permanently displaced hips. In addition to the obvious physical damages, we were impressed by Paul’s testimony that he has been the subject of taunting by schoolmates as the result of his “twisted” walk. We award Paul the sum of $175,000.00 for his damages.
113Janice and Felton McBride, Jason and Paul’s parents, are each awarded $5,000.00 for their loss of consortium claims.
Erie Mazique had several minor injuries, a “messed up lower back” and a fractured pelvis. We award Eric $70,000.00. We also award Charlette Davis, Eric’s mother, $5,000.00 for her loss of consortium claim.
Ponce Taylor suffered a ruptured spleen, which required immediate surgery, cuts on his arm that required sutures, and suffered an infection secondary to his treatment. In addition, he has permanent *259 scars on his stomach and one of his arms. We award Ponce $90,000.00.
Presley and Ruth Taylor, Ponce’s parents, are each awarded $5,000.00 for their loss of consortium claims.
Justin Grimsley suffered broken ribs, a crushed pelvis and pulled ligaments in his back. In addition, he had been treated for several months for problems resulting from the injuries. We award Justin $80,000.00 for his injuries.
Therefore, for the above reasons, we reverse the trial judge’s finding of fault, find the DOTD 25% at fault and Lashonda Williams 75% at fault, and award damages as above, including interest from date of judicial demand, with DOTD to bear half of all Plaintiffs’ court costs and costs of appeal. All damages awarded above are subject to a reduction representing the percentages of fault attributed to the DOTD and Williams.
REVERSED; DAMAGES AWARDED.

REHEARING DENIED.

In their original appellate brief and rebuttal brief, Plaintiffs argued that the trial court erred in finding that DOTD was not at fault. Plaintiffs presented an issue, to apportion fault between the parties, and argued it, without citing La.C.C.art. 2324(B). We ruled as requested and found that DOTD was 25% at fault for the accident in which the Plaintiffs sustained their injuries. Then, in Plaintiffs’ rehearing application, they raise, for the first time, the argument that under La.C.C. art. 2324(B) as it existed at the time of the accident, if DOTD is found partially responsible for the accident, then they are to be held liable for 50% of the damages. At this belated date, on rehearing, we find no merit in Plaintiffs request and argument that we should amend our original ruling and hold DOTD liable for 50% of the Plaintiffs’ damages. For the same reasons, we find no merit in the rehearing request to supplement the record and increase the damage award. Accordingly, we deny the rehearing request.

. The original petition also included a claim for loss of consortium on George and Leona's part. However, there was no evidence pro- . duced at trial in support of this claim.

. We note that 23 U.S.C. § 409 prohibits the introduction into evidence of certain DOTD records compiled “for the purpose of developing any highway safety .... improvement project which may be implemented utilizing Federal-aid highway funds.” Neither party has appealed any of the trial judge's decisions allowing introduction of evidence; therefore, we have reviewed all evidence produced except that proffered.

. We note that some medical records were introduced at trial. However, they were not made part of the record on appeal.